# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Alfred Adams, Petitioner.

Appellate Case No. 2012-212779

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Charleston County
J. C. Nicholson, Jr., Circuit Court Judge

---

Opinion No. 27445
Heard May 7, 2014 – Filed September 10, 2014

---

## REVERSED AND REMANDED

---

Appellate Defender Robert M. Pachak, of Columbia, for
Petitioner.

Attorney General Alan M. Wilson, Chief Deputy
Attorney General John W. McIntosh, Senior Assistant
Deputy Attorney General Salley W. Elliott, and Senior
Assistant Deputy Attorney General Deborah R.J. Shupe,
all of Columbia, and Solicitor Scarlett Wilson, of
Charleston, for Respondent.

---

**JUSTICE KITTREDGE:**  Believing Petitioner Alfred Adams was a drug dealer, officers from the North Charleston South Carolina Police Department (NCPD), acting without a warrant, placed a Global Positioning System (GPS)[1] device on a vehicle driven by Adams.  After monitoring Adams' travel to Atlanta, Georgia, and upon his return to South Carolina, law enforcement stationed a drug canine unit on the interstate within the NCPD's jurisdiction, with instructions to conduct a traffic stop on Adams' vehicle.  An officer conducted the requested traffic stop and discovered cocaine in Adams' possession, which resulted in Adams' arrest.  Adams moved to suppress the drugs, arguing that the warrantless installation of the GPS device violated the Fourth Amendment.  The trial court denied Adams' motion, finding no constitutional violation.  The court of appeals found the warrantless installation of the GPS device violated the Fourth Amendment but determined that the exclusionary rule did not apply because "Adams's traffic violations were intervening criminal acts sufficient to cure the taint arising from unlawfully installing the [GPS] device and monitoring the vehicle."  *State v. Adams*, 397 S.C. 481, 489, 725 S.E.2d 523, 527–28 (Ct. App. 2012).  We reverse and remand.

## I.

In 2008, a confidential informant approached the NCPD and informed officers that Adams was selling cocaine and heroin in the North Charleston area.  The confidential informant informed officers that Adams purchased drugs from Atlanta and New York.  After an investigation, officers installed a GPS device on the undercarriage of Adams' car, which was parked in a public garage in Charleston.  Officers inexplicably did not obtain a warrant or court authorization for the installation of the GPS device.  Thereafter, the officers monitored Adams' movements by way of the GPS data.  Five days after installing the device, the GPS data indicated that Adams' vehicle was in Atlanta.

When Adams' vehicle was returning toward Charleston, investigators contacted Sergeant Timothy Blair and instructed him to position himself, along with a drug canine, at a rest area on Interstate 26 in North Charleston.  Sergeant Blair, who was aware that Adams was a suspected drug dealer, was instructed be on the lookout for Adams and to conduct a traffic stop.  Soon thereafter, Sergeant Blair observed Adams' vehicle and pulled onto the interstate behind it.  A short time later, Adams

---

[1] "Global Positioning System (GPS) data is a technique by which radio signals are received . . . from a system of satellites in geosynchronous orbit and interpreted by programs to provide highly accurate location data."  *In re Smartphone Geolocation Data Application*, 977 F. Supp. 2d 129, 137 (E.D.N.Y. 2013).

committed an improper lane change. Sergeant Blair did not, however, initiate a traffic stop. Instead, Sergeant Blair continued to follow Adams, observed another traffic violation, and waited for Adams to drive near Charleston Southern University before turning on his blue lights and directing Adams to pull over.

This was no ordinary traffic stop. Sergeant Blair immediately called for backup and drew his weapon as he approached the vehicle. The backup officer, Officer James Greenawalt, arrived one or two minutes later. Sergeant Blair directed Greenawalt to remove Adams from the vehicle and run a license check. Meanwhile, Sergeant Blair used the dog to conduct a perimeter sniff of Adams' vehicle. The dog alerted to the driver's door of Adams' vehicle.

At this point, Sergeant Blair instructed Greenawalt to pat Adams down for weapons. In doing so, Greenawalt felt a "jagged, round object" near Adams' groin that he believed to be narcotics. Greenawalt retrieved the item, which was 141.62 grams of cocaine.

Adams was charged with trafficking cocaine and possession with the intent to distribute cocaine within proximity of a school.

## II.

Prior to trial, Adams moved to suppress the seized evidence, contending that the installation and monitoring of the GPS device violated the Fourth Amendment and section 17-30-140 of the South Carolina Code (2014), which requires officers to obtain a court order prior to installing a mobile tracking device.

In response, the State first contended that there was no constitutional violation, relying on *United States v. Knotts* for the proposition that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." 460 U.S. 276, 281 (1983). Second, the State admitted that the officers did not obtain court authorization pursuant to section 17-30-140. In fact, the officers did not even know about the statute's existence. The State nevertheless claimed that, even if the officers violated the statute, suppression was not warranted absent a constitutional violation.

The trial court found that officers violated section 17-30-140 by not obtaining a court order prior to installing the GPS device. Clearly disturbed by the State's failure to comply with section 17-30-140, the trial court remarked: "Start following the statute or at some point in time, [the evidence is] going to be suppressed."

Ultimately, however, the trial court found no constitutional violation and concluded that the statutory violation alone did not warrant suppression of the drug evidence.

The case proceeded to a bench trial. The trial court found Adams guilty of trafficking cocaine and sentenced him to twenty-five years in prison and a $50,000 fine.[2]

Adams appealed to the court of appeals, during the pendency of which, the United States Supreme Court issued *United States v. Jones*, 132 S. Ct. 945 (2012). In *Jones*, the Supreme Court held that "the Government's [warrantless] installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" 132 S. Ct. at 949. While the Supreme Court's holding of a Fourth Amendment violation was unanimous, the majority's rationale was based on a theory of trespass, characterizing the government's conduct as the physical occupation of private property for the purpose of obtaining incriminating evidence. *Id*.

Relying on *Jones*, the court of appeals found that the failure to obtain a warrant violated the Fourth Amendment. *Adams*, 397 S.C. at 488–89, 725 S.E.2d at 527. However, the court of appeals held that the exclusionary rule did not apply because "Adams's traffic violations were intervening criminal acts sufficient to cure the taint arising from unlawfully installing the device and monitoring the vehicle." *Id*. at 489, 725 S.E.2d at 527.

We issued a writ of certiorari to review the court of appeals' decision. The State has not challenged the court of appeals' holding that officers violated the Fourth Amendment. Thus, the only question before this Court is whether suppression may be avoided by the intervening criminal acts doctrine, or some other alternative sustaining ground.

---

[2] The trial court directed a verdict of acquittal for Adams on the proximity charge, for the proximity charge was the result of the officer's decision to conduct the traffic stop near Charleston Southern University. As the trial court observed, "all [Adams] was doing was following the direction of the police officer who stopped him [with] a blue light and he just happened to be across the street from Charleston Southern University." After directing a verdict for Adams, the trial court agreed to the State's request to *nolle pros* the proximity charge.

## III.

"In criminal cases, this Court only reviews errors of law." *State v. Gamble*, 405 S.C. 409, 415, 747 S.E.2d 784, 787 (2013) (citing *State v. Jacobs*, 393 S.C. 584, 586, 713 S.E.2d 621, 622 (2011)). "On appeals from a motion to suppress based on Fourth Amendment grounds, this Court applies a deferential standard of review and will reverse if there is clear error." *State v. Tindall*, 388 S.C. 518, 521, 698 S.E.2d 203, 205 (2010) (citing *State v. Khingratsaiphon*, 352 S.C. 62, 70, 572 S.E.2d 456, 459 (2002)). However, this Court reviews questions of law de novo. *State v. Whitner*, 399 S.C. 547, 552, 732 S.E.2d 861, 863 (2012) (citations omitted).

## A.

Adams contends that the court of appeals erred in finding that his traffic violations were intervening criminal acts that dissipated the taint from the unlawful search and concluding the facts did not warrant suppression. We agree.

The exclusionary rule "is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S. 338, 348 (1974). The remedy of exclusion "compel[s] respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217 (1960) (citation omitted). However, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009) (citing *Illinois v. Gates*, 462 U.S. 213, 223 (1983)). To that end, courts have recognized several exceptions to the exclusionary rule,[3] two of which are implicated in this case—the attenuation/intervening act doctrine and the good-faith reliance exception. We turn first to the court of appeals' holding that suppression was not warranted because Adams' traffic violations were intervening criminal acts.

---

[3] *See, e.g., United States v. Leon*, 468 U.S. 897, 919 (1984) (good-faith reliance); *Nix v. Williams*, 467 U.S. 431, 443 (1984) (inevitable discovery); *United States v. Crews*, 445 U.S. 463, 471 (1980) (independent source doctrine); *Wong Sun v. United States*, 371 U.S. 471, 486–91 (1963) (attenuation).

"Generally, evidence derived from an illegal search or arrest is deemed fruit of the poisonous tree and is inadmissible." *United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2002) (citing *Wong Sung v. United States*, 371 U.S. 471, 484–85 (1963)). "However, not all evidence conceivably derived from an illegal search need be suppressed if it is somehow attenuated enough from the violation to dissipate the taint." *Id*. "To determine whether the derivative evidence has been purged of the taint of the unlawful search, we [may] consider several factors, including: (1) the amount of time between the illegal action and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *United States v. Gaines*, 668 F.3d 170, 173 (4th Cir. 2012) (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

The court of appeals relied on *State v. Nelson*, 336 S.C. 186, 519 S.E.2d 786 (1999), to support its finding of attenuation. We find *Nelson* inapplicable to this case. In *Nelson*, a police officer was driving behind the defendant and flashed his high beam lights to get the defendant's attention. 336 S.C. at 189, 519 S.E.2d at 787. The defendant responded by driving through a stop sign. *Id*. The officer followed and conducted a traffic stop. *Id*. After approaching the vehicle, the officer smelled alcohol, and the defendant refused to participate in field sobriety tests. *Id*. On appeal, this Court held that "even assuming [the officer's] initial attempt to stop Defendant would have violated the Fourth Amendment, [the officer] was nonetheless justified in making the stop after Defendant committed the subsequent traffic infractions." *Id*. at 193, 519 S.E.2d at 789. This Court's rationale was that "'[t]here is a strong policy reason for holding that a new and distinct crime, even if triggered by an illegal stop, is a sufficient intervening event to provide independent grounds for arrest.'" *Id*. at 194, 519 S.E.2d at 790 (quoting *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997)).

Here, however, Adams' traffic violations provide an insufficient attenuation from the taint of the illegal search. The traffic stop was entirely predicated on the information obtained from the GPS device and law enforcement's desire to search Adams and his vehicle for drugs. The patrol officer was instructed to find a basis to stop Adams' vehicle so that a search for drugs could be conducted. Even the trial court, without the benefit of *Jones*, repeatedly referred to the stop of Adams' vehicle as "a trap," noting that officers "would have never got[ten] behind [Adams] to get the traffic violation if [officers] hadn't had the tracking device." The court of appeals characterized the traffic violations as "intervening criminal acts sufficient to cure the taint arising from unlawfully installing the device[,]" a view which we respectfully reject. *Adams*, 397 S.C. at 489, 725 S.E.2d at 527–28.

We cannot endorse the court of appeals' reasoning, which would unwittingly provide a blueprint for circumventing the protections of the Fourth Amendment. Indeed, were we to sanction the intervening acts rule under these circumstances, law enforcement would be free to install a GPS device on a suspect's vehicle without a warrant, track the suspect with impunity, and cure all ills from the underlying Fourth Amendment violation by waiting for a fortuitous traffic offense. *See Maryland v. Wilson*, 519 U.S. 408, 423 (1997) (Kennedy, J. dissenting) ("[United States Supreme Court precedent] allow[s] the police to stop vehicles in almost countless circumstances." (citing *Whren v. United States*, 517 U.S. 806 (1996)); Elizabeth E. Joh, *Discretionless Policing: Technology and the Fourth Amendment*, 95 Cal. L. Rev. 199, 210 n.61 (2007) ("Many traffic officers say that by following any vehicle for 1 or 2 minutes, they can observe a basis on which to stop it.") (citation and quotation omitted)).  Such an affront to the Fourth Amendment would render *Jones* meaningless and would not serve the exclusionary rule's stated purpose of deterring unlawful police conduct.  *See State v. Brown*, 401 S.C. 82, 92, 736 S.E.2d 263, 268 (2012) ("[T]he exclusionary rule's sole purpose is to deter future Fourth Amendment violations . . . .").

Because each of the three attenuation factors weighs against admission of the seized evidence, we hold that Adams' traffic violations were not intervening criminal acts sufficient to dissipate the taint from the underlying Fourth Amendment violation.[4]

## B.

By way of additional sustaining ground, the State invites us to find that the exclusionary rule should not apply because the officers relied in objective good

---

[4] *Accord United States v. Lee*, 862 F. Supp. 2d 560, 564–67 (E.D. Ky. 2012) (applying the exclusionary rule when officers installed a GPS device without a warrant, waited for the defendant to return from a drug pickup, and pulled the defendant over for not wearing a seatbelt, based on a finding that the illegal installation of the GPS device did not sever the causal connection between the illegal search and the stop); *State v. Jackson*, 435 S.W.3d 819, 827 (Tex. App. 2014) (finding that exclusion was appropriate even though officers observed the defendant commit a speeding violation); *Hamlett v. State*, 753 S.E.2d 118, 128 (Ga. App. 2013) (excluding evidence seized after a GPS device was installed on defendant's vehicle without a warrant and officers pulled the defendant over for having a broken brake light).

faith on binding precedent that authorized the placement of a GPS device without a warrant. The presence of our state statute requiring a warrant and the absence of any pre-*Jones* binding precedent in this federal circuit authorizing the placement of a GPS device without a warrant compel us to reject the proposed additional sustaining ground.

In *Davis v. United States*, the United States Supreme Court stated that the exclusionary rule does not apply in cases where "the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful." 131 S. Ct. 2419, 2427 (2011) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). The *Davis* court explained, "[r]esponsible law-enforcement officers will take care to learn 'what is required of them' under Fourth Amendment precedent and will conform their conduct to these rules." *Id*. at 2429 (quoting *Hudson v. Michigan*, 547 U.S. 586, 599 (2006)). "But by the same token, when binding appellate precedent *specifically authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities." *Id*. (first emphasis added). This is so because "[a]n officer who conducts a search in reliance on binding appellate precedent does no more than 'ac[t] as a reasonable officer would and should act' under the circumstances." *Id*. (quoting *Leon*, 468 U.S. at 920).

The State contends that two United States Supreme Court cases—*United States v. Knotts*, 460 U.S. 276 (1983) and *United States v. Karo*, 468 U.S. 705 (1984)— constitute binding precedent that specifically authorized officers to install a tracking device on Adams' car without a warrant. We disagree.

In *Knotts*, law enforcement, with the owner's consent, concealed a beeper[5] in a container of chloroform that was eventually loaded onto a target vehicle. 460 U.S. at 278. Law enforcement then monitored the beeper and maintained surveillance on the target vehicle, ultimately arresting Knotts several days after he took possession of the container. *Id*. at 279. The Supreme Court found no Fourth Amendment violation, upholding the warrantless use of the beeper because "[a]

---

[5] "A beeper is a radio transmitter, usually battery operated, which emits periodic signals that can be picked up by a radio receiver." *Knotts*, 460 U.S. at 277. Conversely, a GPS device uses "signals from multiple satellites" to relay location data (often accurate to within 50 to 100 feet) to a computer. *Jones*, 132 S. Ct. at 948. This distinction is noteworthy because beepers serve as aids to law enforcement already conducting physical surveillance, while a GPS enables officers to take a passive role and simply monitor location data from a computer.

person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id*. at 281.

One year later, in *Karo*, the Supreme Court "addressed the question left open by *Knotts*, whether the installation of a beeper in a container amounted to a search or seizure." *Jones*, 132 S. Ct. at 952 (citing *Karo*, 468 U.S. at 713). In *Karo*, law enforcement officers installed a beeper inside a container of chemicals prior to the container being transferred to the buyer. *Karo*, 468 U.S. at 707. "As in *Knotts*, at the time the beeper was installed the container belonged to a third party, and it did not come into possession of the defendant until later." *Jones*, 132 S. Ct. at 952 (citing *Karo*, 468 U.S. at 708). The Court held that, because the beeper was installed with the consent of the owner of the container, no search or seizure occurred because "[t]he mere transfer to Karo of a can containing an unmonitored beeper infringed no privacy interest." *Karo*, 468 U.S. at 712.

Neither *Knotts* nor *Karo* involved, much less expressly or impliedly authorized, a physical trespass as occurred in this case. As the Supreme Court observed in *Jones*, "*Knotts* noted the limited use which the government made of the signals from [the] particular beeper, and reserved the question whether different constitutional principles may be applicable to dragnet-type law enforcement practices of the type that GPS tracking [makes] possible . . . ." *Jones*, 132 S. Ct. at 952 n.6 (internal citations and quotations omitted). Moreover, no pre-*Jones* precedent in this federal circuit extended *Knotts* or *Karo* to the installation and monitoring of a GPS device. We conclude *Knotts* and *Karo* did not constitute binding precedent that authorized law enforcement's warrantless actions in this case.

Having found no support in federal jurisprudence for the State's use of the GPS in this case, we turn now to South Carolina law.

Prior to *Jones*, no South Carolina appellate decision addressed the constitutionality of the warrantless installation and monitoring of a GPS device. There is, however, a state statute that squarely addresses law enforcement's use of electronic tracking devices. In 2002, as a part of the South Carolina Homeland Security Act,[6] the legislature enacted a statute that provides that "[t]he Attorney General or any solicitor may make application to a judge of competent jurisdiction for an order authorizing or approving the installation and use of a mobile tracking device by the

---

[6] Act No. 339, 2002 S.C. Acts 3619.

South Carolina Law Enforcement Division or any law enforcement entity of a political subdivision of this State." S.C. Code Ann. § 17-30-140(A). This statutory requirement "provide[s] law enforcement . . . with the proper means and tools to enable them to protect and defend South Carolina and her citizens while preserving individual constitutional rights and liberties." Act No. 339, 2002 S.C. Acts 3625.

At the suppression hearing, the State acknowledged to the trial court that the officers involved in the investigation did not know about this statutory requirement but sought to justify the failure to obtain a court order pursuant to the statute on the basis that the officers "didn't know they had to." We reject this proposition, for it is a well-established principle, often advanced by the State in criminal prosecutions, "that ignorance of the law is no excuse." *State v. Binnarr*, 400 S.C. 156, 160 n.7, 733 S.E.2d 890, 892 n.7 (2012). There would be a "fundamental unfairness [in] holding citizens to 'the traditional rule that ignorance of the law is no excuse,' while allowing those 'entrusted to enforce' the law to be ignorant of it." *United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003) (internal citation omitted) (quoting *Bryan v. United States*, 524 U.S. 184, 196 (1998)). In fact, the officers' lack of knowledge of the existence of section 17-30-140 is exacerbated in this case because the statute had been in effect for almost *six years* at the time the NCPD was investigating Adams.

Because the only binding law in this case was a statute that *forbade* law enforcement officers from installing a GPS device on Adams' car without court authorization, there is no support for the State's invocation of the good-faith reliance exception as an additional sustaining ground to uphold the conviction.[7]

## IV.

The exclusionary rule is a judicially created remedy for a Fourth Amendment violation. The primary rationale for the exclusionary rule is to deter police

---

[7] *Accord State v. Mitchell*, 323 P.3d 69, 78 (Ariz. Ct. App. 2014) (rejecting application of the good-faith exception rule because "no binding Arizona or Supreme Court authority explicitly authorized law enforcement to trespass onto private property to obtain information"); *People v. LeFlore*, 996 N.E.2d 678, 691 (Ill. 2013) (rejecting application of the good-faith exception in a GPS case); *State v. Allen*, 997 N.E.2d 621, 626–27 (Ohio Ct. App. 2013) (rejecting application of the good-faith exception in light of the "unsettled nature of the issue surrounding Fourth Amendment constraints on GPS attachment and tracking" prior to *Jones*).

misconduct.  Where there is no misconduct, and thus no deterrent purpose to be served, suppression of the evidence is an unduly harsh sanction.  Other judicially created rules—such as the intervening acts doctrine and the good-faith reliance exception—have developed to avoid suppression.  As discussed above, we are constrained to reject the State's reliance on the intervening acts doctrine and the good-faith reliance exception.  We do not make our decision lightly.  In reversing the court of appeals, we are mindful of and respect greatly the burdens faced daily by our state's law enforcement officers.  We are guided by the rule of law, which provides no basis to uphold the denial of Adams' motion to suppress.  In law, the ends do not justify the means.

**REVERSED AND REMANDED.**

**TOAL, C.J., PLEICONES, HEARN, JJ., and Acting Justice James E. Moore, concur.**